58 So.2d 126

### FRANKLIN LIFE INS. CO. v. STRENGTH.

#### 4 Div. 184.

Court of Appeals of Alabama.
Dec. 4, 1951.

Rehearing Dismissed Feb. 19, 1952.

C. L. Rowe, Elba and E. C. Orme, Troy, for appellant.

J. C. Fleming, Elba, for appellee.

HARWOOD, Judge.

This is an appeal from a verdict and judgment in favor of the plaintiff rendered in a suit for disability benefits claimed under a policy issued by the defendant, The Franklin Life Insurance Company.

Disability benefits were claimed for the months of February, March, April, May, and June, 1949.

In addition to the general issue the defendant interposed a special plea setting up the terms of the contract of insurance limiting disability benefits to such illnesses as "wholly, necessarily, and continuously disable and prevent the insured from performing each and every duty pertaining to his occupation for the period the insured shall live and be so disabled and thereby necessarily, strictly and continuously confined within the house and therein regularly visited and attended by a legally qualified physician or surgeon other than himself."

The insurance policy also contained an exclusion clause for the first ninety days of qualifying illness.

For the plaintiff Dr. E. G. Bragg testified that he saw plaintiff during the period in question and found him to be suffering from a gastric disturbance and bronchorhea. Such condition would render the plaintiff unable to perform manual labor. The approved treatment is to keep such a patient in the open air and sunshine.

The plaintiff offered in evidence the records showing the dates the plaintiff was seen by the doctor.

These records show that in February 1949 he made 3 house calls, and the plaintiff came to his office 6 times; in March the plaintiff made 4 office calls; 3 office calls in April, and 3 in May.

In his own behalf the plaintiff testified on direct examination that he first called a doctor in May 1948. Dr. Johnson saw him 2 or 3 times, then he called Dr. Bragg.

He was confined to his bed when he was first taken sick, and later was taken to a hospital in Enterprise where he remained for 3 days in June 1948.

Upon his return from the hospital in Enterprise he was treated by Dr. Bragg, whom he saw on an average of about twice a week. He also was treated by Dr. Grimes of Enterprise, to which place he went several times to see this doctor.

During this time the plaintiff also went to see Dr. Johnson and Dr. Killingsworth at Brundidge, Dr. Holman at Ozark, and Dr. Harold Watkins of Montgomery. He was driven to Montgomery some 8 or 10 times to consult Dr. Watkins.

On cross-examination the plaintiff testified that upon his return from the hospital in Enterprise he stayed in bed for about a week. After that he went to see Dr. Grimes at the clinic, not the hospital, in Enterprise about every two weeks.

During the fall of 1949 while he was at his father's house he had an attack and was taken to the clinic in Enterprise.

It appears that on all of his trips to the clinic in Enterprise the plaintiff would remain for the time necessary to be seen by a doctor.

The plaintiff testified that he spent most of the time in bed, and that when he was out of bed he "was not doing anything, just stirring around."

In January 1949 he drove his car some, going to Elba and to Brundidge.

During the spring of 1949 he went fishing "a number of times," at places from a quarter of a mile to one and a quarter miles distance from his home.

His home is, and was at the time of his illness, 22 miles from Elba, 23 miles from Enterprise, and 11 miles from Brundidge.

During the time for which disability payment is claimed, the plaintiff testified that he visited the hog and cattle sales at Brundidge probably four times, and during this time he attended some hog sales at Elba. He would remain at these sales from one to three hours.

While he had cattle carried to these sales he did not think any were sold during his visits, and he did not buy anything at the sales.

During the time of his claim for disability payments the plaintiff had also gone to one or more banks to transact business. In connection with this activity the plaintiff testified as follows:

"Q. During that time have you been to town to transact any business at a bank? A. Yes.

"Q. Where did you do your banking business? A. Different places.

"Q. What were the places you were doing your banking business, we will say from November, 1948 to June 30, 1949? A. Some at Enterprise, some in Elba, and some in Brundidge.

"Q. Who would go with you when you would go to the bank? How often would you say you visited a bank during this period? A. Not so many times.

"Q. How many times would you say? A. Well, I wouldn't say.

"Q. Would you say you went to each one of them as much as three or four times? A. Yes, I have been to each one, I would say—No, I wouldn't say that. I don't think I have.

"Q. Would you go to any one of them as much as three or four times? A. Yes, I have.

"Q. Which place did you go to most? A. The Brundidge Bank.

"Q. The bank in Brundidge? A. Yes.

"Q. What was your business at the Brundidge Bank, Mr. Strength? A. If I had a draft on something I carried it to the bank.

"Q. You would carry the draft up there and put it in for collection? A. Put it on deposit.

"Q. You mean like a check or something? A. That is right.

"Q. You would go up there and make a deposit? A. Yes".

■ This court has considered the construction of an identical "house confinement" clause in a case in which the opin-

ion is being published simultaneously with this opinion. This is the case of Franklin Life Insurance Company v. Lewis, Ala. App., 55 So.2d 518.[1] In the Lewis case, supra, Carr, P. J., has reviewed the constructional doctrines enunciated by the courts of numerous of our sister states when they considered similar provisions to the one now before us. No useful purpose would be served by further elaboration of these principles in this opinion, other than to note that this court is persuaded that injustice would result if a literal and strict construction be applied to such a clause as is now before us, which view would bar a recovery despite the medical necessity of an insured leaving his house for proper and adequate examination and treatment. See Sheets v. Farmers & M. Mutual L. Ins. & C. Ass'n, 116 Kan. 356, 225 P. 929.

A liberal construction does not imply or necessitate an unreasonable construction.

Counsel for appellant in their argument urge that definite and concrete rules be laid down for future guidance. Since this type of case depends on the individual facts adduced in each case, the possibility of workable and satisfactory rules is of necessity restricted. Just what limitations should be put on the activities allowed an insured under such house confinement clause cannot be spelled out with certainty. Too many twilight zones can easily be conjured up.

We are clear to the conclusion that the contract should not be so literally construed as to deny the insured recovery because of all departures from the house. Indeed some absences cannot reasonably be looked upon as anything other than a substitute for the house confinement, and would in no way tend to encourage malingering or bad faith on the part of the insured. Such instances are visits to hospitals, clinics, or a doctor's office, or to other places for treatment. Such substitute confinement generally is far less pleasant than confinement in one's house. We think short walks in one's yard or neighborhood, or even short automobile rides, when prescribed by an insured's physician, well within the concept of substitute confinement.

When however the activity breaking the continuity of the house confinement partakes more of a purely personal nature than it does of a therapeutic nature then the confinement clause must be deemed breached, even though it might be that the activity of a personal nature also could be therapeutically beneficial to some degree.

We are further equally clear to the conclusion that if the insured's permissible activity be enlarged to allow conduct which is not basically and primarily therapeutic in nature, then violence, if not complete destruction, will result to such confinement clauses. While such clauses may not be desirable from the standpoint of the insured, the insurer had the right to prescribe the conditions under which it would be liable, and to impose limitations looking toward "discouraging the protraction of illness for the purpose of securing the fruits of the insurance contract." See Reeves v. Midland Casualty Co., 170 Wis. 370, 174 N.W. 475, 477.

Certainly under those portions of the facts in this case showing that some of the questioned activity of the insured was primarily of a business nature, i. e. his trips of eleven miles distance to his bank or banks on several occasions for the purpose of transacting business, necessitates the conclusion that as a matter of law the insured was not "necessarily, strictly and continuously" confined within a house during the period of his claimed disability. Further such activity cannot rationally be looked upon as being of a nature solely conducive to ending the insured's house confinement and total disability.

It is our opinion therefore that the lower court erred in denying the appellant's requested charges which were affirmative in nature.

Reversed and remanded.

CARR, P. J., concurs in conclusion.

1. Ante, p. 313.

426

On Rehearing

PER CURIAM.

Appellant's motion to dismiss appellee's motion for rehearing granted. Sup.Ct. Rule 38 Code 1940, Tit. 7, Appendix; De Graaf v. State, 34 Ala.App. 137, 37 So. 2d 130.